# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SUSAN WILLIAMS | * | |
| | * | |
| Plaintiff, | * | Case No.: 8:21-cv-02775-GLS |
| | * | |
| v. | * | |
| | * | |
| DOLGENCORP, LLC | * | |
| d/b/a DOLLAR GENERAL | * | |
| | * | |
| Defendant. | * | |
| | * | |

***********************************************************************

## PLAINTIFF'S REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION IN LIMINE

Table of Contents

I. Facts ……………………………………………………………………………………2

II. Argument Against Summary Judgment …………………………………………..6

III. Argument Against Defendant's Motion in Limine to Exclude Plaintiff's Expert………11

IV. Conclusion …………………………………………………………………………..13

# PLAINTIFF'S REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION IN LIMINE

**COMES NOW** the Plaintiff, Susan Williams by and through undersigned counsel, and files this Memorandum of Fact and Law in support of its Reply to Defendant's Motion for Summary Judgment and Motion in Limine in support states:

## I. FACTS

On or about February 4, 2019, the Plaintiff entered the Dollar General in Denton, Maryland. After finishing her shopping, the Plaintiff was standing in line at the register on a mat that had not been on the floor on her previous trips to the store, she was loading the items into her shopping cart behind her and to her left. As she began to head out, pushing her cart, the mat, which was not commercial grade and suitable for commercial premises, rolled up and caused the Plaintiff to trip and fall. Plaintiff landed on her left side, causing her severe, and permanent injuries, including shattering her left wrist, chronic pain, limited mobility & a 21% permanent-partial impairment of her left upper extremity & 13% impairment to her whole person.

On or about April 8, 2019, Plaintiff's counsel sent a Letter of Preservation to the Defendant requesting that they preserve any records, reports, or videos footage from the date of the incident. **See April 8, 2019, letter attached hereto as Plaintiff's Exhibit 1 (JA0074).** Defendant chose to destroy the mat in question that caused the injuries to the Plaintiff. Defendant also chose not to save the video from the checkout aisle where the injury happened.

Two important things should be noted.

First, Dollar General had another video of the store on the day in question but indicated it no longer had video of the specific area of where Plaintiff fell. There was no explanation why the store would retain video from one part of the store but not the part where Plaintiff fell.

Second, in discovery it was uncovered that Dollar General has two approved mats for their stores. The mat that was in the checkout aisle was *not* one of the approved mats and Dollar General has not been able to identify what mat it was, or what were the mat's characteristics. **See October 21, 2022, Email from Christopher R. Dunn Counsel for Defendant Marked as Plaintiff's Exhibit 2 (JA0075-76).** The lack of a mat is the basis of their motion as it allows them to argue Plaintiff doesn't have an expert to testify that the mat was inappropriate for commercial use.

Defendant's Store Manager at the time Rosalind Jackson testified that Dollar General does on occasion put down mats in the checkout isles like the one that Plaintiff was injured on. **See excerpts from Rosalind Jackson deposition Marked as Exhibit 3**, ("RGD") 16 (JA0078). Ms. Jackson was not sure when Dollar General began putting mats in the aisle where customers are checking out, but they were put out to make it easier for the customers to stand. RGD 16-17 (JA0078-0079). At Ms. Jackson's deposition she stated that Dollar general does not have a policy for placement of mats for customers. That she has never placed a mat at the checkout register for the customers and that if a mat was to be placed at the checkout register, she was not sure who would make that decision. RGD p. 18 (JA0080).

Ms. Jackson later testified that she had no idea who directed the placement of the mat that Susan Williams slipped on in the checkout aisle on that day. RGD 22 (JA0081). She stated that she had no idea why a mat would or would not be placed in the area for customers to stand on in the aisle RGD 34 (JA0082). Furthermore, she mentioned that Dollar General does not maintain any inspection logs for floor inspections, as supported by the Defendant's Answers to Interrogatories. RGD 40-41 (JA0083-0084). Additionally, she expressed uncertainty about whether the store was conducting daily scheduled visual safety checks, as required by the store handbook. RGD 41 (JA0084).

Ms. Jackson also indicated that she was unaware of any specific policies Dollar General had regarding inspections of carpets or mats around the store. RGD 50-51 (JA0085-0086). She testified that anyone at the store could be responsible for ensuring that the mats were shaken out and cleaned and she had no knowledge of any store policy regarding mat maintenance. RGD 53 (JA0087). Furthermore, she was unaware of any other guidelines regarding the placement or movement of mats used by Dollar General. RGD 59 (JA0088).

Plaintiff's account of the events was that the rug was situated in the checkout aisle, and when she attempted to maneuver her cart, the rug buckled, causing her to fall. **See excerpts from Susan Williams' deposition, marked as Plaintiff's Exhibit 4**, ("SW") 33 (JA0090). Ms. Williams observed that on the day of the incident, there were two checkout lanes open, with only one lane having a mat in the aisle. SW 34 (JA0091). Dollar General has not offered an explanation as to why the unauthorized mat was in the checkout aisle – let alone only one of the two checkout aisles. Ms. Williams noted that there was no apparent necessity for a mat, considering it was a warm, clear day, SW 36 (JA0092). Non-slip mats are often placed in wet areas such as the front entrance on a rainy day. When asked in her deposition about whether she noticed the mat upon entering the store, she responded that it wasn't something she typically pays attention to. SW 37 (JA0093).

While waiting at the checkout counter, Ms. Williams first noticed the mat, describing it as multicolored, with rubber edges and carpeted, but not resembling the black rugs Dollar General typically places at the entrance during rainy weather. SW 40 (JA0094). When Ms. Williams approached the register, she had to unload her own basket and place everything on the counter herself. SW 41 (JA0095). Additionally, she had to bag her items herself, and to stow the bags in her cart, she had to turn around 180 degrees. SW 44 (JA0096). She pointed out a large window

adjacent to the register, stating that despite numerous prior visits to the store, she had never seen a rug in that particular location before. SW 41 (JA0095).

When presented with images of typical Dollar General mats, Ms. Williams stated that those were not the type of mats she encountered in the checkout aisle on the day she fell. SW 48 (JA0097). It is clear from Ms. Willaims testimony that she has never seen a mat before in that checkout aisle and there would have been no reason for a mat on that day.

It appears evident from Ms. Jackson's testimony that Dollar General was not adequately ensuring the inspection of mats within the store – or even know what mat was down or where it had come from as it was not an authorized mat. There are potential hazards associated with improperly maintained mats, or mats which are not commercial grade, with weighted edges and non-slip backing to prevent the bunching up which occurred and caused Ms. Williams' fall. Ms. Jackson's statements indicate a lack of clarity regarding who was responsible for overseeing mat maintenance and whether regular inspections were conducted. Prior to the accident, Dollar General failed to make a reasonable inspection of the premises and specifically the mats at the checkout isle.

The subsequent action taken by Dollar General to dispose of the unknown mat, and failure to preserve video of the mat while preserving other video from that day, allows a fact finder to reasonably conclude they recognized the danger it posed to customers. Removing the mat indicates an acknowledgment of the risk of slip and falls associated with its presence. Defendant's spoliation of evidence requires a jury instruction on spoliation, and the presumption that had the mat and video been available, their presence would have been detrimental to the Defendant. This shifts the burden of proof to Defendant and at least presents a jury question as to whether Dollar General

was negligent, knew, or should have known, about the danger of the mat. In other words, Plaintiff has sufficient evidence to present a jury question as to whether Dollar General was negligent.

## II. ARGUMENT AGAINST SUMMARY JUDGMENT

**A. It was negligent for Dollar General to put an obstruction in the checkout lane while they knew the customers would be looking at the goods in the checkout aisle and would be taking with the cashier.**

Plaintiff's recounting of the law in Maryland around negligence for a slip and fall case as laid out in *Maans v. Giant of Md.*, L.L.C., 161 Md. App. 620, 623 (2004), *Joseph v. Bozzuto Management Co., et al.*, 173 Md. App. 305, 918 A.2d 1230 (2007), *Rawls v. Hochschild Kohn & Co.*, 207 Md. 113, A.2d 406, 407 (1955), is a fair and accurate representation of the law as it stands today.

In the context of dangers created by third parties or other patrons of a business cases like *Moulden v. Greenbelt Consumer Services*, Inc., 239 Md. 229, 232, 210 A.2d 724 (1965) and *Lexington Market Authority v. Zappala*, 233 Md. 444, 446, 197 A.2d 147 (1964), two case cited by the Defendant, would be instructive. In *Moulden*, the Plaintiff slipped on a green bean and the court granted Defendant's motion for summary judgment because any fact finder would be guessing as to how the green bean got there in the first place. In *Zappala*, the plaintiff sustained injuries from falling on oil or grease that she did not see on the pavement of a parking garage. The court could not find negligence because oil or grease could have leaked from another customer's car moments before the plaintiff returned to her vehicle. *Zappala*, 233 Md. 444 at 446. However, in *Zappala* and *Moulden* the plaintiff never alleged that the defendant itself created the condition.

In contrast to those two cases, this case does not focus on the duty to inspect for hazards created by third parties. Here the Plaintiff has alleged affirmative acts by the Defendant, consisting

of putting an obstruction on the ground of the checkout line aisle. Here the danger to the Plaintiff was created by the Defendant. Defendant choose to place an unauthorized mat in the checkout aisle therefore it is up to the jury to determine where Defendant was negligent as well as the reasonableness of the Defendant's conduct in failing to appreciate the dangers with placing a mat, let alone an unauthorized mat of unknown origin, characteristics, or suitability for commercial use, in the center of the checkout lane.

The cases *Chalmers v. Great Atlantic & Pacific Tea Company*, 172 Md. 552, 192 A. 419 (1937), *Tennant v. Shoppers Food Warehouse Md Corp*., 115 Md. App. 381, 390 (1997), and *Diffendal v. Kash & Karry Service Corp*., 74 Md. App. 170, 536 A.2d 1175 (1988) are much more analogous to this case.

In *Chalmers,* after stepping away from the meat counter in a grocery store, the plaintiff slipped and fell over a display box. The Court in Chalmers reversed a directed verdict in favor of the defendant because of the following:

> It would seem that, even in a grocery and provision store, where the articles offered for sale are irregularly placed about the floor, since it is intended that purchasers will inspect and select such articles as they desire to purchase from those offered for sale, the owner is under a duty to provide reasonably safe passageways to afford access to different parts of the store, where customers are expected to go.
>
> The storekeeper expects and intends that his customers shall look not at the floor but at the goods which he displays to attract their attention and which he hopes they will buy. He at least ought not to complain, if they look at the goods displayed instead of at the floor to discover possible pitfalls, obstructions, or other dangers, or if their purchases so encumber them as to prevent them from seeing dangers which might otherwise be apparent. Patrons are entitled therefore to rely to some extent at least upon the presumption that the proprietor will see that the passage ways provided for their use are unobstructed and reasonably safe.

*Chalmers*, 172 Md. at 556, 559.

What the court held in *Chalmers* is directly on point in this case as well, "Whether under the circumstances its conduct in placing the box in the aisle, or permitting it to remain there, was

consistent with due care, was peculiarly a jury question." Id. at 558. In this case it is a question for the jury to decide if the checkout lane was unobstructed and reasonable safe.

In *Diffendal*, the customer tripped and fell over an "L-bed cart" in the frozen food aisle of a grocery store. In vacating the summary judgment for the Defendant the court reasoned that the fact that the possessor of the premises has eye-catching objects on display which divert the visitor's attention is an important factor for consideration. *Diffendal*, 74 Md. App. at 175. In view of the fact that there were displays all around the area in which Plaintiff fell the court cannot say as a matter of law that Plaintiff failed to exercise due care for her own protection. Id. Whether or not Plaintiff was using the caution expected of a reasonably prudent person under the circumstances was a question of fact for the jury and not of law for the court. Id. Again the final holding of the case is on point in this matter, "We see a distinction between the failure to see a man, at eye level who is clearly visible, and the failure to see an L-cart, which rests inches off the ground." Id at 178. There is a genuine dispute of material fact in this case at hand; was it negligent for Dollar General to put an obstruction in the checkout lane while they knew the customers would be looking at the goods in the checkout aisle and would be taking with the cashier?

In *Tennant,* the court noted that although there was some dispute as to whether the patron's fall was caused by slipping on vegetable leaves or falling over a box, it was undisputed that she was injured while shopping near a produce display in the store. The court held that summary judgment was not appropriate because it was a question of fact for the jury to determine whether there was negligence by the store or whether it was reasonable for the patron to fail to notice the dangers under the display.

The Court in *Tennant* held that when determining whether a business visitor's failure to notice a dangerous condition on the premises constitutes negligent inattention, the presence of eye-

8

catching displays that divert the visitor's attention is a significant factor to consider. *Tennant*, 115 Md. App. 381, 383. Whether a plaintiff in a personal injury case exercised the expected degree of care of a reasonably prudent person under the circumstances is a factual question for the jury, not a legal one for the court. Id at 395. It is reasonable to infer that an ordinarily prudent person, while shopping in a supermarket with their attention drawn to displayed merchandise, could potentially make an error of judgment and trip over an object positioned in an aisle near the merchandise displays. Id.

Defendant's reliance on *Mouldin* is a mistake as *Moulden*, like *Zappala*, suggests that the notice issue generally arises when the dangerous condition is created by a third party. In contrast to those cases notice is not at issue in the case at hand. Defendant does not deny putting the mat in the middle of the checkout lane aisle. Defendant does not deny knowledge of the mat in the aisle. In light of the above Defendant's reliance on *Moulden* is misplaced because the danger in this case was not created by a third party but by the Defendant. Based on the facts of this case viewed in the light most favorable to the non-moving party it is for the jury to determine if the Defendant created a dangerous condition, about which it knew or should have known.

**B.      The intentional destruction of the mat by Defendant gives rise to the inference that had the mat not been destroyed it would have been unfavorable to the Defendant.**

Numerous cases have held that spoliation of evidence should lead the trier of fact to draw a negative evidentiary inference or presumption against the spoliator. See *Larsen v. Romeo*, 254 Md. 220, 228, 255 A.2d 387 (1969); *Maszczenski v. Myers*, 212 Md. 346, 355, 129 A.2d 109 (1957); *Anderson v. Litzenberg*, 115 Md. App. 549, 561-62, 694 A.2d 150 (1997); *DiLeo v. Nugent*, 88 Md. App. 59, 71, 592 A.2d 1126, (1991); 3 *Miller v. Montgomery County*, 64 Md. App.

202, 214-15, 494 A.2d 761 (1985), *Burkowske v. Church Hosp. Corp.*, 50 Md. App. 515, 523-24, 439 A.2d 40 (1982).

The Doctrine of Spoliation is clear. When a party has possession of a piece of evidence at a time he knows or should have known it will be evidence in a controversy, and thereafter disposes of it, makes it unavailable, or fails to produce it, the law presumes that the piece of evidence, had it been produced, would have been unfavorable to the party that did not produce it. *Miller,* 64 Md. App. 202, at 214. This presumption rests upon the logical presumption that a party would not destroy evidence favorable to themselves.

Moreover, during the discovery process, it was revealed that the Defendant exclusively acquired two specific types of mats for the store, with all orders limited to these two types**. See Exhibit 2 (JA0075-0076).** Contrarily, on the day of the incident, the mat in question was of a third type with an unknown quality. **See Exhibit 2 (JA0075-0076).** Given the implications of the doctrine of spoliation and the presence of this third mat type at the store on the day of the incident, the jury may reasonably infer that the mat causing the Plaintiff's trip and fall was defective.

The Defendants neglected to preserve both the mat and the video of the incident, despite receiving a preservation letter. Aware of the crucial nature of the mat and video as evidence in the controversy, the Defendant opted to destroy both. Consequently, the law now presumes that the mat and video, if produced, would have been unfavorable to the Defendant.

Slip and fall cases are generally hard to win even when the dangerous object is retrieved by the Plaintiff. These types of cases would be close to impossible if the evidence could be destroyed without any consequences. Plaintiff is entitled to present to the finder of fact the spoliation argument and Defendant is entitled to present an explanation for their destruction of the

mat and video, and it is for that fact finder to decide whose explanation they believe. In this case the fact finder should determine the consequences of Defendant's actions.

### III. Argument Against Motion in Limine

Regarding the Plaintiff's expert, Kevin Foreland, the Court possesses broad discretion in permitting expert testimony and can evaluate the evidence as it deems appropriate. It is presumed, because of the spoilation, and a permissible inference by the fact finder that the Defendant placed an item in the store aisle that did not meet commercial-grade standards, was unsuitable for commercial premises, or not properly maintained. The Plaintiff's expert is qualified to testify, drawing on his twenty-seven years of experience, education, and teaching, that a mat violated industry standards. While an expert might typically opine based on an examination of the mat, or the video or photos of the mat, that can't be done in this case as Defendant disposed of any evidence which would allow the opinion Defendant asserts is required. Consequently, Forehand's opinion is a retailer cannot put tripping hazards in the areas where customers will walk. The fact finder can hear this opinion and give it the weight the fact finder considers appropriate.

**A.    The *Daubert* tests is flexible, and Plaintiff's expert is qualified to testify based on his specialized knowledge and training in the retail industry.**

It is well recognized that the trial judge possesses a broad discretion in passing upon the qualifications of an expert. *United States v. Viglia*, 549 F.2d 335, 337 (5th Cir. 1997). A proposed expert witness should not be required to satisfy an overly narrow test of his own qualifications, not have certificates of training, nor memberships in professional organizations, nor need he be, an outstanding practitioner in the field in which he professes expertise. *United States v. Barker*, 553 F.2d 1013, 1024 (6th Cir.1997). But the only question for the trial judge who must decide whether or not to allow the jury to consider a proffered expert's opinions is, "whether his knowledge of the

subject matter is such that his opinion will most likely assist the trier of fact in arriving at the truth." *Holmgren v. Massey-Ferguson, Inc*., 516 F.2d 856 (8th Cir. 1975).

A district court's admissibility determination is not intended to supplant the adversarial process. *Bielskis v. Louisville Ladder, Inc*., 663 F.3d 887, 889 (7th Cir. 2011). Shaky expert testimony may be admissible, subject to attack on cross-examination. Id. It is important to note that no matter how the Defendant wishes to characterize the *Daubert* tests *Daubert* is a flexible test and no single factor, even testing, is dispositive. Id.

Dr. Forehand has spent more than twenty years in professional work within the retail operations, manufacturing, and sales industries, including six years in management with Walmart and another decade as vice president for a retail music outfit. His work included responsibilities for safety, security, risk management, sales, operations, and other areas. Dr. Forehand has also spent more than ten years teaching retail management to college students, and for eight years he served as director for the real estate and retail management programs at American Public University and American Military University.

Dr. Forehand has published several academic articles on retail operations, customer service and management. He has also appeared on podcasts to discuss retail management issues and industry trends.

Dr. Forehand holds a Doctorate of Business Administration (DBA) in Management from Northcentral University and an MBA from Thomas University. He is a member of several retail industry organizations including the American Collegiate Retailing Association (ACRA) and the National Retail Federation (NRF).

Defendant wishes to subvert the adversarial process by having Plaintiff's expert disqualified before the trial even begins. As outlined above Dr. Forehand is qualified to give his

opinion based on his specialized training and firsthand experience running retail stores. If Defendant feels that Dr. Forehand's years of specialized experience, teaching, articles, and memberships groups make him a "shaky" expert witness then they will have their time to sway the jury during cross examination. Defendant's brief lists five pages of requirements for an expert witness to give testimony but it should not be that complicated in this matter. Dr. Forehand's years of experience and qualifications above will make his opinion assist the trier of fact in arriving at the truth.

Dr. Forehand's opinions will be the product of years of specialized knowledge, training, and his qualifications. Dr. Forehands has never inspected, tested, measured, or weighed the mat in question because Defendant destroyed the mat before he could get the opportunity to review it. Given his qualifications and specialized knowledge, Dr. Forehand's testimony would most likely assist the trier of fact in understanding why retailers should not put tripping hazards in the places they know customers will walk.

## IV. Conclusion

This Honorable court should deny the Defendant's Motion for Summary Judgment because it is for the jury to determine if the Defendant's mat created a dangerous condition, about which it knew or should have known and given the doctrine of spoliation and the presence of this third mat type at the store on the day of the incident, the jury may reasonably infer that the mat causing the Plaintiff's trip and fall was defective.

This Honorable Court should also deny Defendant's Motion in Limine as Dr. Forehand is qualified to be an expert witness based on his training, experience, and specialized knowledge and his testimony will assist the trier of fact in finding out the truth.

Respectfully submitted,

**BYRD & BYRD, LLC**

/s/
_____
Timothy P. Leahy #15084
14300 Gallant Fox Lane, Suite 120
Bowie, MD 20715
(301) 464-7448 Ext. 105
(301) 805-5178 Fax
TLeahy@byrdandbyrd.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 18, 2024 a copy of the foregoing was emailed, served via MDEC, and/or mailed, first class postage prepaid, to:

Decaro, Doran, Siciliano,
Gallagher & DeBlasis, LLP
Christopher R. Dunn, #05278
17251 Melford Boulevard, Suite 200
Bowie, Maryland 20715
(301) 352-4950
(301)352-8691 (Fax)
Cdunn@decarodoran.com
Counsel for Defendant Dollar General

**/s/**
_____
Timothy P. Leahy, CPF No. CPF# 0012130017