## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | | |
|---|---|---|
| **SUSAN WILLIAMS,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Case No. GLS 21-2775** |
| | : | |
| **DOLGENCORP, LLC** | : | |
| **d/b/a DOLLAR GENERAL,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Susan Williams ("Plaintiff") filed the instant negligence lawsuit against Defendant Dolgencorp, LLC d/b/a Dollar General ("Defendant"), after she tripped, fell, and injured herself at one of the Defendant's stores. (ECF Nos. 1, 3).[1]

Now pending before this Court[2] is "Defendant's Motion for Summary Judgment and Motion *in Limine* to Exclude Plaintiff's Expert Kevin Foreland [sic]." (ECF No. 47). Plaintiff filed an opposition, and the Defendant filed its Reply. (ECF Nos. 52, 53). The matter has been fully briefed; accordingly, no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023).

For the reasons set forth below, the motion is **GRANTED.**

---

[1] Initially, Plaintiff initiated suit in the Circuit Court for Prince George's County, Maryland against the Defendant. The Defendant then timely removed the case to federal court. (ECF Nos. 1, 3).

[2] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of this Court to conduct all further proceedings in this case, to include through trial, entry of final judgement, and resolution of post-judgment proceedings. (ECF No. 14).

I.     **SUMMARY JUDGMENT MOTION**

A.  **Factual Background**[3] [4]

On February 4, 2019, at approximately 11:30 a.m., Plaintiff arrived at the Doller General store ("the Store") located in Denton, Maryland to shop. (JA0074; Deposition of Susan Williams, "Plaintiff Dep.," 36:6-8, JA0092). Plaintiff's friend, Polly Styles, was with her at the Store that day. (Plaintiff Dep., JA0002). The Store was not crowded and there was only one register open. (Plaintiff Dep., JA0004).

When Plaintiff first entered the Store, she did not see a mat on the floor in the checkout aisle. (Plaintiff Dep., JA0004). Plaintiff first noticed a mat there when she was in line to purchase her merchandise. (*Id.*).

Just before Plaintiff fell, she stood in the checkout aisle, and Ms. Styles was in line there in front of her. (Plaintiff Dep., JA0004-05). Ms. Styles was standing on the checkout aisle's mat while she was purchasing her merchandise, which was "just laying down flat." (Plaintiff Dep., JA0005, JA0012). Plaintiff did not notice Ms. Styles have any trouble with the mat when Ms. Styles pushed the shopping cart away from the register. (Plaintiff Dep., JA0005). When it was Plaintiff's turn to check out, Plaintiff moved forward in the aisle and stood on the mat for approximately ten minutes while the manager, Ms. Jackson, scanned her items. (Plaintiff Dep.,

---

[3] The parties submitted a Joint Appendix. (ECF No. 54, "JA"). Defendant's submissions can be found in this range: JA Nos. 0001-73; 0098-103. Plaintiff's submissions can be found in this range: JA Nos. 0074-97. The Court will refer to the documents contained therein as, e.g., JA0001. Regrettably, the Joint Appendix is missing evidence that the parties argue has relevance to the Court's analysis. For example, in the Opposition, Plaintiff relies on deposition testimony that the mat in the checkout aisle did not look like "Exhibit 2" to support her claim that the mat in the checkout aisle was not one of the typical mats used by the Store. (ECF No. 52, p. 5, which cites to Plaintiff Dep. 48:1-14, JA0097). The "Exhibit 2" referenced in Plaintiff's deposition is missing from the Joint Appendix. In addition, Defendant appears to refer to what is marked "Exhibit 1" in the Joint Appendix as "Exhibit 3" in its Motion for Summary Judgment. (ECF No. 47, p. 4). Furthermore, the parties included only page 6 of the Store Employee Safety Handbook ("Handbook") in the JA. (JA0073). However, there are references to other pages of the Handbook that were not included in the JA. (*See, e.g.*, Jackson Dep. 51:3-14; JA0086, which refers to page 7 of the Handbook). To resolve the Motion, then, the Court only analyzed the evidence actually before it.

[4] The Court views all evidence regarding the incident in the light most favorable to the Plaintiff, the nonmoving party. *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021).

JA0007-08; Deposition of Rosalind Jackson, Store Manager and Corporate Designee, "Jackson Dep.," 7:5-17, 11:6-17, 11:19-21, JA0016, JA0018). Plaintiff's shopping cart was "catty corner" to the register counter so she could load her bags of merchandise into her shopping cart. (Plaintiff Dep., JA0095). Once Plaintiff finished loading her shopping cart with the purchased merchandise, she took her first step and fell sideways, landing on her left side. (Plaintiff Dep., JA0011-13; Jackson Dep., JA0019).

After her fall, Plaintiff saw that the mat was "messed up," and that the corner of the mat was folded over. (Plaintiff Dep., JA0006). Plaintiff did not notice whether the mat was "buckled" before she fell. (Plaintiff Dep., JA0012-13). Plaintiff did nothing to flip the mat over or cause the mat to "buckle" in a way that caused her to fall. (Plaintiff Dep., JA0012-13). Neither did Plaintiff's foot cause the rug to "buckle." (Plaintiff Dep., JA0012). Instead, Plaintiff surmises that "it had to be the cart because -- otherwise I would have tripped or something. But for me to fall sideways and out of control, totally out of control, no, I didn't do anything or flip anything over. My cart had to have done it." (Plaintiff Dep., JA0012). In sum, Plaintiff believes that her cart caused the mat to fold over or "buckle" in a way that caused her to fall.

Two women who were in the Store that day helped Plaintiff to her feet. (Plaintiff Dep., JA0014). Ms. Jackson also offered assistance to Plaintiff and inquired whether she should call 911; however, Plaintiff declined, telling Ms. Jackson that she was "all right." (Jackson Dep., JA0019). After Plaintiff stood up, she gathered her things, gave Ms. Jackson her information so that Ms. Jackson could complete an incident report, and then Plaintiff left the Store. (Jackson Dep., JA0020).[5]

---

[5] The parties included several facts in their briefing and the JA, none of which are material to the question of whether the Defendant acted negligently by placing a mat in the checkout aisle, which Plaintiff believes was unreasonably dangerous, i.e., created a "tripping hazard." *See, e.g.*, JA0005, JA0008, JA0021-23, JA0073, JA0075-76, JA0084-87,

### B. Parties' Arguments

Defendant argues that entry of summary judgment in its favor is appropriate because Plaintiff cannot establish that it was negligent. Specifically, Defendant first asserts that, even when construing the facts in the light most favorable to Plaintiff, Plaintiff cannot establish that Defendant created the allegedly-dangerous condition. Second, no reasonable jury could find, on this record, that Defendant had actual or constructive knowledge of the allegedly-dangerous condition for a reasonable period of time before the incident occurred. (ECF No. 47, "Motion," pp. 6-12).

Plaintiff counters that Defendant is not entitled to summary judgment for two reasons. (ECF No. 52, "Opposition," pp. 5-7). First, that because Defendant intentionally placed the mat in the checkout aisle, which Plaintiff believes to be unreasonably dangerous, Defendant had actual knowledge of a condition that it created (i.e., a "tripping hazard"). Thus, in this case, Plaintiff is not required to establish that Defendant had constructive knowledge of the condition that it created. Second, Defendant destroyed the mat and video footage, despite receiving a preservation letter. Thus, Plaintiff is entitled to have the trier of fact draw the negative inference that had this evidence been preserved, it would have been unfavorable to the Defendant. (Opposition, pp. 9-11).

In its Reply, Defendant generally maintains that there are no facts in the record to support that it created a dangerous condition (had actual notice), nor is there evidence that it had constructive notice of a dangerous condition (the mat) for sufficient enough time before the incident such that it had a duty to address the "dangerous" condition or to warn customers about it. (ECF No. 53, "Reply," p. 7). Finally, Defendant contends that there is no evidence that it engaged in spoliation. (*Id.*, p. 3).

Ultimately, then, Defendant argues that Plaintiff has not provided sufficient evidence to

---

JA0078-80, JA0094-95, JA0097, JA0099-100. *See also* Sections I.E., I.F. for an analysis of the law and the facts material to the negligence question.

prevail on her negligence claim, including because expert testimony is necessary to establish that Defendant's negligently placed the mat in the checkout aisle, so summary judgment is appropriate.

### C. Spoliation

In this Circuit,[6] spoliation has been defined as "the destruction or material alteration of evidence or the failure to preserve property" that a party could use as evidence "in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (internal citations omitted); *see also Boone v. Everett*, 751 F. App'x 400, 401 (4th Cir. 2019) (per curiam).

A movant who contends that spoliation has occurred and seeks a sanction must demonstrate that:

> (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Charter Oak Fire Ins. Co. v. Marlow Liquors, LLC*, 908 F. Supp. 2d 673, 678 (D. Md. 2012) (internal citations and quotation marks omitted); *see also QueTel Corp. v. Abbas*, 819 F. App'x 154, 156 (4th Cir. 2020) (citing *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013)) (explaining that a party may be sanctioned if the duty to preserve material evidence existed, and the party willfully engaged in conduct that resulted in the destruction of evidence when the party knew or should have known that the destroyed evidence was or could be relevant in litigation).

The Plaintiff contends that "[a]ware of the crucial nature of the mat and video as evidence

---

[6] In her Motion, Plaintiff relies solely on state court decisions in support of her arguments for spoliation. In federal court, spoliation issues are governed by federal law. *See Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 449 (4th Cir. 2004) (explaining that even when a federal court sits in diversity jurisdiction "the decision to impose . . . a sanction [for spoliation of evidence] is governed by federal law").

in the controversy, the Defendant opted to destroy both." (Opposition, p. 10). Consequently, then, Plaintiff submits that the "the law presumes that the mat and video would have been unfavorable to the Defendant." (*Id.*, pp. 5-6). Defendant maintains that the video footage was taped over prior to receipt of Plaintiff's preservation letter and therefore it was unable to preserve the footage by the time it was placed on notice to do so. (Reply, p. 3).

The law is clear that Plaintiff, as the party moving for spoliation sanctions, has the burden to put evidence before the Court and has the burden to satisfy all of the *Charter Oak* elements. *Charter Oak*, 908 F. Supp. 2d at 678.

The Court addresses Plaintiff's claims of spoliation of the mat and the video in turn to determine whether Plaintiff has met her burden.

1. The Mat

Regarding the mat, there is no **evidence** before the Court that the Plaintiff asked the Defendant to preserve the mat, including by sending a preservation letter. *See* JA0001-103. Indeed, there is no preservation letter that relates to the mat. *See* JA0074. Equally important, there is no evidence in the record regarding what happened to the mat in question; thus, there is no evidence that the mat was destroyed. Therefore, to the extent that Plaintiff asserts that Defendant had an obligation to preserve the mat, the Court finds that Plaintiff has not put forth evidence that the mat was destroyed by the Defendant, nor has Plaintiff put forth any evidence that Defendant had an obligation to preserve the mat when it was allegedly destroyed. Relatedly, there is no evidence before the Court that any actions taken by Defendant related to the mat—whatever they were— were accompanied by a culpable state of mind. Thus, Plaintiff has failed to meet her burden under *Charter Oak*. Accordingly, the Court declines to find that the burden of proof has been shifted to the Defendant and that a jury question has been presented as to whether the Store "was negligent,

knew, or should have known, about the dangers of the mat." (Opposition, p. 6).

In sum, the Court declines to find that spoliation of the mat has occurred and declines to draw any factual inferences in Plaintiff's favor related to the mat.

### 2. The Video Footage

#### a. *Evidence in the Record Related to the Video Footage*

Ms. Jackson completed an incident report on the day following Plaintiff's fall. (Jackson Dep., JA0022). Shortly after the fall was reported, Lisa White, Claims Manager-Dollar General Risk Management, asked the video vendor to go to the Store and download the video that captured the periods of time before and after the incident. (White Affidavit, ¶5, JA0102). The vendor downloaded "all the video from all ten cameras" in the Store on February 4, 2019, from 12:31 P.M. to 1:00 P.M. (*Id.*, ¶6).

On April 8, 2019, Plaintiff's counsel sent a "Notice of Preservation" to the Defendant. (JA0074). In the preservation letter, Plaintiff's counsel requested that the Store preserve "any records, reports, or video footage from February 4, 2019." (*Id.*). Counsel for Plaintiff further requested that the Store produce a copy of the video footage. (*Id.*).

After the Defendant received the preservation letter, it discovered that the footage the vendor downloaded did not capture Plaintiff's fall. (White Affidavit, ¶7, JA0102). After April 8, 2019, the vendor returned to the Store and discovered that all footage from February 4, 2019 had been taped over. (*Id.*, ¶8). Footage is taped over automatically every four to six weeks, depending on the amount of activity the motion sensor cameras capture. (*Id.*). Once video is taped over, it cannot be recovered. (*Id.*, ¶9).

#### b. *Analysis of the Charter Oak Factors*

Regarding the video footage, the Court begins its spoliation analysis by examining the third

*Charter Oak* factor: relevance. The term "relevance" in the spoliation context has been "broadly construed to encompass *any* possibility that the information sought *may be* relevant to the *claim* or *defense* of any party." *O'Malley v. Trader Joes East, Inc.*, Civ. No. RDB 19-3273, 2020 WL 6118841, at *3 (D. Md. Oct. 15, 2020) (internal citations and quotation marks omitted) (emphasis added). Plaintiff's negligence claim is based on her fall, which Defendant does not dispute was captured on the video. The video is therefore clearly relevant to Plaintiff's claim. Accordingly, a "reasonable factfinder could conclude that the [evidence] would have supported her claim." *Charter Oak*, 908 F. Supp. 2d at 678.

The Court next analyzes the first *Charter Oak* element: whether Defendant had an obligation to preserve the video footage at the time that it was recorded over.

As a preliminary matter, it is worth noting that "there is no general duty to preserve documents, things or information, whether electronically stored or otherwise." *Victor Stanley Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 520 (D. Md. 2010), *aff'd in part, modified in part*, Civ. No. MJG 06-2662, 2010 WL 11747756 (D. Md. Nov. 1, 2010) (further citation omitted). Rather, a party seeking spoliation sanctions must establish that the party with the evidence had an obligation to preserve it. *Charter Oak,* 908 F. Supp. 2d at 678.

In general, the duty to preserve arises "at the point in time when litigation is reasonably anticipated." *Victor Stanley,* 269 F.R.D. at 520. Correspondence that threatens litigation likely triggers a party's duty to preserve evidence, because at that point a party has reason to anticipate litigation and implement a litigation hold to preserve evidence for use in the likely litigation. *Goodman v. Praxair Services, Inc.*, 632 F. Supp. 2d 494, 511 (D. Md. 2009); *see also Turner*, 736 F.3d at 282 (finding no duty to preserve in the absence of any correspondence threatening litigation). Once a lawsuit has been filed, a party is clearly on notice of a duty to preserve evidence.

The Court finds that Plaintiff first notified Defendant of her intent to sue on or about April 8, 2019 when she sent her preservation letter. (JA0074). Thus, on or about April 8, 2019 is the first date that Defendant had an obligation to preserve evidence. *See Goodman*, 632 F. Supp. 2d at 511; *Turner*, 736 F.3d at 282. Second, the reasonable inference drawn from Ms. White's affidavit is that the February 4, 2019 video footage was likely recorded over automatically four to six weeks after it was created; i.e., on or before March 18, 2019. (White Affidavit, ¶8, JA0102). Thus, the reasonable inference drawn from the evidence before the Court is that the video footage from February 4, 2019 no longer existed by the time Plaintiff sent her April 8, 2019 letter to the Defendant.

The Court next analyzes the second *Charter Oak* element: whether the Defendant had a culpable state of mind when the video was recorded over.

Under this second element—and to ultimately prevail on the spoliation issue—the movant must also establish that the party that destroyed the evidence was at fault, in other words, acted with "bad faith, willfulness, gross negligence, or ordinary negligence." *Victor Stanley*, 269 F.R.D. at 520 (citing *Goodman*, 632 F. Supp. 2d at 518). Thus, a court must consider a party's state of mind when determining whether a sanction is appropriate. *Id.* at 529. "Ordinary negligence" means that a party failed to "identify, locate, and preserve evidence, where a reasonably prudent person acting under like circumstances would have done so." *Membreno v. Atlanta Restaurant Partners, LLC.*, 338 F.R.D. 66, 72 (D. Md. 2021) (further citation omitted). "Gross negligence requires a similar showing as ordinary negligence, but to a greater degree." *Id.* A court can find willfulness and bad faith when a party's conduct is "intentional, purposeful, or deliberate." *Victor Stanley*, 269 F.R.D. at 529. "Bad faith" means that a party destroys evidence "for the purpose of depriving the adversary of evidence." *Membreno*, 338 F.R.D. at 73 (citing *Goodman*, 632 F. Supp. 2d at 520).

"Willfulness [requires] a demonstration of intentional or deliberate conduct resulting in spoliation." *Id.* (citing *Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir. 2008)).

Plaintiff has not met her burden of demonstrating that Defendant acted with ordinary negligence. The evidence before the Court demonstrates that Defendant did not receive correspondence related to the pending litigation until Plaintiff's April 8, 2019 preservation letter arrived. (JA0074). Given the Defendant's video recordation policy, the Court cannot find that a "reasonably prudent person" should have identified, located, and preserved evidence before April 8, 2019. *Membreno*, 338 F.R.D. at 72. Plaintiff has also failed to meet her burden of establishing "bad faith." Plaintiff has not put evidence before the Court that, at the time that the February 4, 2019 footage was recorded over, Defendant did so with the intent to deprive her of the evidence. Indeed, Ms. White's affidavit suggests otherwise: the video footage was automatically recorded over on or before March 18, 201,9 due to the four-to-six-week recordation policy. (White Affidavit, ¶¶5-6, JA0102). Thus, Plaintiff also fails to meet her burden of demonstrating that Defendant intentionally or deliberately spoliated evidence. *Membreno*, 338 F.R.D. at 73.

In sum, because Plaintiff has not established that the destruction or loss was accompanied by a culpable state of mind at the time that the evidence was recorded over, Plaintiff has not met her burden of demonstrating that Defendant had an obligation to preserve the February 4, 2019 footage when it was recorded over on or before March 18, 2019. *See Charter Oak*, 908 F. Supp. 2d at 678. Accordingly, no spoliation sanction, including drawing an adverse inference against the Defendant, related to the video, is warranted.

### D.  Legal Standard for Summary Judgment

A court must grant a motion for summary judgment if the moving party demonstrates that there is no genuine dispute as to any material fact, such that the moving party is entitled to

judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson*, 477 U.S. at 248)).

The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Wit Man Tom v. Hosp. Ventures, LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020). The burden can be satisfied through the submission of, e.g., deposition transcripts, answers to interrogatories, admissions, declarations, stipulations, and affidavits. *Celotex Corp.*, 477 U.S. at 323; *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984); *see also* Fed. R. Civ. P. 56(c)(1).

To defeat a motion for summary judgment, the nonmoving party cannot simply rest on allegations averred in its opposition or other brief. Rather, the nonmoving party must demonstrate that specific material facts exist that give rise to a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 323; *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003); *see also* Fed. R. Civ. P. 56(c)(1), 56(e).

A court must construe the facts and draw all reasonable inferences therefrom in the light most favorable to the party opposing the motion. *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). Summary judgment is inappropriate if sufficient evidence exists from which a reasonable jury may decide in favor of the non-movant. *Anderson*, 477 U.S. at 250. However, a court has an "[affirmative obligation] to prevent factually unsupported claims and defenses from proceeding to trial." *Heckman v. Ryder Truck Rental, Inc.*, 962 F. Supp. 2d 792, 799-800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)). Thus, the

parties cannot create genuine disputes of material fact "through mere speculation or compilation of inferences." *Taylor v. Wal-Mart Stores East, L.P.*, Civ. No. JMC 22-3366, 2023 WL 6445928, at *2 (D. Md. Oct. 3, 2023) (further citation omitted).

### E.  Negligence

Under Maryland law, a negligence claim requires a plaintiff to establish the following elements: (1) that a defendant had a duty to protect the plaintiff from injury; (2) that the defendant breached that duty; (3) that the plaintiff suffered actual loss or injury; and (4) that the loss or injury proximately resulted from the defendant's breach of its duty. *Joseph v. Bozzuto Mgmt. Co.*, 918 A.2d 1230, 1234-35 (Md. Ct. Spec. App. 2007) (citing *Valentine v. On Target, Inc.*, 727 A.2d 947, 949 (Md. 1999)). As is relevant in this case, determination of the summary judgment motion directly implicates the first and second elements of negligence.

In Maryland, the duty of care owed by a proprietor of a store to the individuals who enter the premises is predicated upon the legal status of the individual. *Durm v. Walmart, Inc.*, Civ. No. ADC 20-2809, 2021 WL 3930709, at *3 (D. Md. Sept. 2, 2021); *see also Tennant v. Shoppers Food Warehouse Md. Corp.*, 693 A.2d 370, 374 (Md. Ct. Spec. App. 1997). The highest duty is owed to an invitee, someone who is invited or permitted on the premises for business purposes. *Tennant*, 693 A.2d at 374. Here, the parties do not dispute that Plaintiff was an invitee.

A storekeeper owes a business invitee/customer a duty to use reasonable and ordinary care to maintain its premises "in a reasonably safe condition." *Chamberlain v. Denny's Inc.*, 166 F. Supp. 2d 1064, 1068 (D. Md. 2001). That being said, a storekeeper is not an insurer of its customers' safety, and "no presumption of negligence arises merely because an injury was sustained on a storekeeper's premises." *Rehn v. Westfield America et al.,* 837 A.2d 981, 984 (Md. Ct. Spec. App. 2003) (quoting *Giant Food, Inc. v. Mitchell*, 640 A.2d 1134, 1135 (Md. 1994)).

Rather, a storekeeper can be found liable for negligence only if it fails to "observe the duty of ordinary and reasonable care." *Chamberlain*, 166 F. Supp. 2d at 1068. Thus, a customer bears the burden of establishing that the store owner:

(1) has actual or constructive notice of the hazardous condition;
(2) should have anticipated that the customer would not discover the condition or would fail to protect herself against it; and
(3) failed to take reasonable steps to make the premises safe or give adequate warning on the condition.

*Sinnott v. Wal-Mart, Inc.,* Civ No. AMD 99-2494, 2000 WL 33281683, at *2 (D. Md. July 14, 2000), *aff'd* 3 F. App'x 128 (4th Cir. 2001); *see also Linderborn v. Armadillo Ventures, LLC*, Civ. No. CCB 19-2532, 2021 WL 322179, at *4 (D. Md. Feb. 1, 2021).

Regarding the first element, it is important to note that, per Maryland law, "there are two distinct notice requirements depending on whether the dangerous condition was created by an overt act of the defendant or by a third party." *Frostbutter v. Bob Evans Farms, Inc.*, Civ. No. CBD 12-2388, 2013 WL 4026985, at *5 (D. Md. Aug. 6, 2013) (citing *Keene v. Arlan's Dep't Store of Baltimore, Inc.*, 370 A.2d 124, 128 (Md. Ct. Spec. App. 1977)). In so-called "over act" cases, "where the defendant [has] intentionally and purposefully created the condition [that] the plaintiff alleges to be unreasonably dangerous," notice is usually not at issue because it is the storeowner who performed an act that created the condition. *Frostbutter*, 2013 WL 4026985, at *5 (citing *Keene*, 370 A.2d at 128); *see also Cheskis v. Safeway, Inc.*, Civ. No. DLB 19-1734, 2021 WL 3852295, at *6 (D. Md. Aug. 27, 2021) (citing *Keene*, 370 A.2d at 128); *Altice v. AMF Bowling Ctrs.*, Civ. No. DKC 06-949, 2007 WL 9782549 at *3 (D. Md. Apr. 13, 2007) (ruling that plaintiff need not provide evidence that defendant had notice of a dangerous condition where evidence existed that defendant created the dangerous condition); *Chamberlain*, 166 F. Supp. 2d at 1068 (finding that plaintiff need not prove notice where proof exists that defendant created the dangerous

condition). In these kinds of cases, then, "a defendant can be presumed to have actual knowledge of a condition that it created itself." *Frostbutter*, 2013 WL 4026985, at *5.

Examples of "overt act" cases include: *Tennant,* 693 A.2d at 375 (defendant grocery store employee swept cabbage and spinach into a pile and left an empty box under a display case, both of which plaintiff alleged that she tripped on); *Frostbutter*, 2013 WL 4026985 (storeowner installed a decorative curtain under a sink in its bathroom, which plaintiff alleged that she tripped on); *Cheskis*, 2021 WL 3852295 (a storeowner employed a contractor who newly-waxed the floors followed by an employee who newly-washed the floors, which plaintiff allegedly slipped on immediately thereafter); *see also Taylor,* 2023 WL 6445928 (sufficient evidence existed that storeowner's employee knew of a rubber doormat placed up against the doorway, which plaintiff allegedly slipped and fell upon). In these kinds of cases, then, "a defendant can be presumed to have actual knowledge of a condition that it created itself." *Frostbutter*, 2013 WL 4026985, at *5.

These cases and others reflect that the issue of constructive notice arises in what are often called "foreign substances" or "foreign object" "slip and fall" cases. That is because "foreign object/substance" cases "address the duty of a property owner to exercise reasonable care to discover and remove hazards that have been left by a third party or by forces of nature." *Frostbutter*, 2013 WL 4026985, at *5 (citing *Deering Woods Condo. Ass'n v. Spoon*, 833 A.2d 17, 24-25 (Md. 2003)). Examples of "foreign object/substance" cases include: *Moulden v. Greenbelt Consumer Servs., Inc.*, 210 A.2d 724, 726 (Md. 1965) (plaintiff tripped on a string bean on the floor of a grocery store aisle, and there was no evidence that the storeowner's employees put the bean on the floor; it was more likely a customer who dropped the bean); *Rehn,* 837 A.2d at 982 (third party spilled soda on the floor of a fast-food restaurant); *McCoy v. Target Corp.*, Civ. No. GLR 14-3437, 2016 WL 827962, at *2 (D. Md. Mar. 3, 2016) (plaintiff slipped on liquid on the

14

floor in the aisle and there was no evidence that the storeowner left the liquid on the floor or otherwise created the hazard). Thus, it is typically in these "foreign substance" cases where constructive notice is the issue, and "time on the floor evidence" is most relevant. In such cases, the courts "have been reluctant to conclude that the store owner had notice where it is unclear how long the hazardous condition existed and the hazardous condition could have been created by a [third party]." *Altice*, 2007 WL 9782549, at *3 (citing *Keene*, 370 A.2d at 128).

The instant case falls within the category of "overt act" cases, not within the category of "foreign substance/object" cases. The Court finds, when construing the facts in the light most favorable to Plaintiff, that there is ample evidence that Defendant committed an overt act by placing the mat in the checkout aisle. For example, Plaintiff reports that she first saw the mat on the floor in the checkout aisle when she was in line to be rung up. (Plaintiff Dep., JA0003). Ms. Jackson similarly corroborates that there was a mat on the floor at the register that day. (Jackson Dep., JA0021). Importantly, Ms. Jackson testified during her deposition that the Store has previously placed mats in the checkout aisle for the customers to stand on while in front of the registers. (Jackson Dep., JA0079). Upon review of the record, then, it is undisputed that the Defendant intentionally placed the mat in the checkout aisle. Thus, the Court finds that the Defendant clearly had actual knowledge of the mat's existence in the checkout aisle.

Relatedly, then, to the extent the Defendant relies on *Carter v. Shoppers Food Warehouse MD Corp.*, 727 A.2d 958 (Md. Ct. Spec. App. 1999), to argue that it is entitled to summary judgment because Plaintiff has failed to put time-one-the-floor evidence before the Court, the Court finds such reliance misplaced. In *Carter*, the court addressed the issue of how long the condition of the mat, namely that "the carpet was turned up," existed prior to the plaintiff's fall. 727 A.2d at 966-67. Put another way, the inquiry was whether the defendant in *Carter* had actual

or constructive notice of a condition created by some unknown third-party. *Id.* That places *Carter* directly within the within the category of cases in which the hazard was created by a third party and notice is at issue. As the Court has ruled, notice is not at issue because it is undisputed that the Defendant placed the mat in the checkout aisle and had actual notice of the mat's existence. Thus, *Carter* is not instructive.

That being said, even though undisputed evidence exists that the Defendant is responsible for the mat's placement, Plaintiff must still prove the "existence of an unsafe or dangerous condition on the premises." *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 451-52 (4th Cir. 2004). Put another way, Plaintiff must still establish that by putting the mat in the checkout aisle Defendant created a dangerous condition, and it did so **negligently**. *Altice*, 2007 WL 9782549 at *4 (emphasis supplied) (first citing *Tennant*, 693 A.2d at 377, then citing 1 Dan B. Dobbs, The Law of Torts § 235, at 603 (2001)); *accord Gentry v. Shop N. Save Warehouse Foods, Inc.*, 708 F. Supp. 2d 733, 737 (C.D. Ill. 2010) (finding that "plaintiffs can avoid the notice requirement only if they establish that the mats were negligently placed on the floors by the agents of the Defendants, not merely by showing that they were placed by the agents of the Defendant").

In the instant case, Plaintiff asserts that by placing the mat in the checkout aisle, Defendant created a dangerous condition ("tripping hazard"), which caused her to fall. Another court in this District has held that where a plaintiff alleges negligence "from falling on a floormat, Maryland's highest court has mandated" that:

> Before the plaintiff [can] recover, it [is] necessary for her to show either that the damage was caused by the servants of the defendants negligently moving the mat so as to make [plaintiff] stumble and fall, or that the accident happened through a discoverable defect in the mat, not probably patent to the traveler, and that there was fault in the defendants not discovering the defect and removing or warning the traveler of it.

*Taylor*, 2023 WL 6445928, at *4 (quoting *Weidman v. Consolidated Gas, Elec. Light & Power Co.*

148 A. 270, 272 (1930)). Thus, it is inappropriate for a court to grant summary judgment in favor of a defendant in the negligent floormat context unless the evidence "fails to show any negligence on the part of [the defendant] in the selection, use, care, maintenance, or condition of the runner or mat over which plaintiff tripped." *Taylor*, 2023 WL 6445928, at *4 (quoting *Weidman*, 148 A. at 272).

### F.  Analysis Related to Negligence

The issue before the Court is whether the Defendant breached its duty to Plaintiff by placing the mat in the checkout aisle. Analyzing the relevant law, and viewing the facts in the light most favorable to Plaintiff, the Court must determine whether sufficient facts exist from which a reasonable jury could conclude that the Defendant was negligent in its "selection, use, care, maintenance, or condition" of the mat in question. *Taylor*, 2023 WL 6445928, at *4 (quoting *Weidman*, 148 A. at 272).

Plaintiff argues that "Defendant choose[sic] to place an authorized mat in the checkout aisle" and "therefore it is up to the jury to determine where[sic] Defendant was negligent as well as the reasonableness of the Defendant's conduct in failing to appreciate the dangers with placing a mat, let alone an unauthorized mat of unknown origin, characteristics, or suitability for commercial use, in the center of the checkout lane." (Opposition, p. 7). In so arguing, Plaintiff relies on "overt act" cases, namely, *Diffendal v. Kash & Karry Serv. Corp.*, 536 A.2d 1175 (Md. 1988), *Chalmers v. Great Atlantic & Pacific Tea Co.*, 192 A. 419 (Md. 1937), and *Tennant v. Shoppers Food Warehouse Md. Corp.*, 693 A.2d at 375. The Court finds those cases distinguishable for the following reasons.

First, the issue in *Diffendal* was whether the plaintiff was contributory negligent in failing to notice the L-cart on the floor. 536 A.2d at 1177. No such argument has been advanced in this

case and as such contributory negligence is not at issue. Thus, *Diffendal* is not instructive. Next, both *Chalmers* and *Tennant* involved obvious physical obstructions in the aisles. *See Chalmers*, 192 A.2d at 420 (a box in an aisleway near a meat counter); *Tennant*, 693 A.2d at 372-73 (cabbage leaves swept into a pile and a box on the floor in the produce aisle). Here, the mat is not a raised, physical obstruction like the boxes and cabbage leaves in *Chalmers* and *Tennant*. The Court instead finds that *Weidman* and the analysis therein is instructive when the inquiry involves a mat on the floor. *See* 142 A. at 272. As held above, per *Weidman*, in the floormat context, to survive summary judgment a plaintiff must establish a genuine dispute of material fact as to the defendant's negligence in its selection, use, care, maintenance, or condition of a mat *See* 142 A. at 272. The Court thus conducts a *Weidman* analysis as set forth below.

As a preliminary matter, the Court finds *Taylor v. Wal-Mart Stores* instructive. *Taylor* was an "overt act" case that addressed whether a defendant was negligent in its placement of a mat. 2023 WL 6445928 at *4-5. The court in *Taylor* held that there was a genuine issue of material fact as to whether the defendant was negligent because there was deposition testimony in the record that a mat should not be placed near the doorway. *Id.* In other words, there was evidence that the defendant store's **use** of the mat, by placing it in a location contrary to store policy, was negligent and therefore summary judgment was inappropriate.

Applying *Weidman* to the facts of this case, the Court finds that there is no evidence in the record regarding how the Defendant came to select the mat in question when placing it in the checkout aisle. *See* JA0001-103. Similarly, there is no evidence before the Court as to the condition of the mat to suggest that the mat was defective. (*Id.*). While Plaintiff avers that the mat is of "unknown origin, characteristics, or suitability for commercial use," *see* Opposition, p. 7, there is no such evidence in the record before the Court. (JA0001-103). Nor is there any evidence that the

Store improperly cared for or maintained the mat in question. (*Id.*). To the contrary, Ms. Jackson reports that on a weekly basis the Store's floor mats were shaken out and cleaned. (Jackson Dep., JA0086-87). Thus, under *Weidman*, the remaining relevant inquiry is whether the Store was negligent in its use of the mat by placing the mat in the checkout aisle.

Contrary to Plaintiff's assertion that the mat was "unauthorized," there is no evidence in the record before the Court that Store policy prohibited mat placement in the checkout aisle. (JA 0001-103). Indeed, Ms. Jackson testified that the Store had previously placed mats in the checkout aisle for customers to stand on. (Jackson Dep., JA0079).[7] Thus, the Court finds that, unlike in *Taylor*—where there was evidence that the mat should not have been placed in a location—there is no evidence that the mat was improperly placed in the checkout aisle. Therefore, the only evidence that placing the mat in the checkout aisle is dangerous comes from the opinions of Plaintiff's proffered expert, which as discussed below, the Court will exclude.[8] Accordingly, Plaintiff has failed to produce any admissible evidence that creates a genuine dispute of material fact regarding whether the Defendant was negligent in its use of the mat.

In sum, even when viewing the facts in the light most favorable to the Plaintiff, and drawing all reasonable inferences in her favor, the Court cannot find that there is evidence in the record that Defendant acted negligently in its selection, use, care, maintenance, or condition of the mat, and thus no reasonable jury could so conclude. *See Weidman*, 148 A. at 272. Accordingly, summary

---

[7] While the Handbook directs employees to inspect for tripping hazards, the Court finds that under the law, as set forth in Section I.E, *supra*, the duty to inspect is relevant in the dangers-created-by-a-third-party or "foreign substance" cases where notice is at issue. (JA0073). As already held, notice is not at issue in this case and therefore, the Defendant's duty to inspect, whatever it may be, is not relevant to the inquiry of whether it was negligent when it intentionally placed the mat in the checkout aisle.

[8] *See* Section II *infra*.

judgment is appropriate.[9]

## II.    MOTION *IN LIMINE* RELATED TO PLAINTIFF'S PROPOSED EXPERT WITNESS

### A.  Parties' Arguments

Apparently, Plaintiff has identified "Kevin A. Foreland" as an expert witness. *See generally* Opposition, p. 11; *see also* JA0024-0072.[10] From the record, it appears that Plaintiff seeks Mr. Foreland's qualification as an expert in the areas of "store operations, safety, risk management and standards of care," which Plaintiff believes qualifies him to opine on the mat's placement in the Store, and opine that it created a tripping hazard. (Deposition of Kevin Foreland, "Foreland Dep.," 6:9-19, JA0039; *see also* Opposition, pp. 11-13).

In seeking summary judgment, Defendant argues that the Court should not consider the opinions offered by Mr. Foreland, Plaintiff's proffered expert witness, because they are inadmissible under Federal Rule of Evidence 702. Specifically, Defendant first contends that Mr. Foreland lacks the requisite skill, experience, training, education, and/or specialized knowledge to offer an expert opinion. Second, Defendant asserts that Mr. Foreland lacks sufficient facts or data to offer an opinion, and lacks reliable principles and methods to apply to the facts. Third, Defendant

---

[9] Interestingly, in one breath, Plaintiff argues that the Store's placement of the mat itself is a tripping hazard, *see* Opposition, pp. 5-9, while also surmising, in a confusing fashion, that the cart that she had been pushing forward might have played a role in causing the mat to "buckle." After her fall, Plaintiff saw that the mat was "messed up," and that the corner of the mat was folded over. (Plaintiff Dep., JA0006). Plaintiff did not notice whether the mat was "buckled" before she fell. (Plaintiff Dep., JA0012-13). Plaintiff did nothing to flip the mat over or cause the mat to "buckle" in a way that caused her to fall. (Plaintiff Dep., JA0012-13). Neither did Plaintiff's foot cause the rug to "buckle." (Plaintiff Dep., JA0012). Instead, Plaintiff surmises that "it had to be the cart because -- otherwise I would have tripped or something. But for me to fall sideways and out of control, totally out of control, no, I didn't do anything or flip anything over. My cart had to have done it." (Plaintiff Dep., JA0012). A reasonable jury could find that it was her conduct that contributed to her fall.

[10] The Joint Appendix does not contain Mr. Foreland's resume or curriculum vitae. *See* JA0001-103. Rather, evidence regarding Mr. Foreland's qualifications can only be found in select pages from his deposition transcript. *See* JA0024-72. Many of these pages are not consecutive pages from his deposition testimony. *See, e.g.,* JA0040, JA0041, JA0044-45, JA0050-60, JA0061. Consistent with the law, *see* Section I.D., *supra*, and Section II.C., *infra*, the Court only analyzed the evidence before it, not the parties' arguments about facts not in the record. *See* Fed. R. Civ. P. 56(c)(1), (c)(3); *Celotex Corp.*, 477 U.S. at 323; *Barwick*, 736 F.2d at 958.

avers that Mr. Foreland fails to reliably apply a methodology or principles to the facts in this case in order to offer his opinions. In sum, Mr. Foreland's opinions are neither relevant nor reliable under *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993). (Motion, pp. 13, 15-16, 27-31; Reply, pp. 11-13).[11]

Plaintiff first counters that Mr. Foreland, based on his "twenty-seven years of experience, education and teaching," is qualified to be an expert. (Opposition, p. 11). According to Plaintiff, this experience makes him an expert who can offer an opinion "that [the] mat violated industry standards." (*Id.*). Relatedly, Plaintiff contends that Mr. Foreland's opinions will assist the trier of fact in understanding why mats should not be placed in locations where retailers know customers will walk. Plaintiff also contends that because Defendant disposed of the mat and video footage, Mr. Foreland could not conduct the testing he ordinarily would. (*Id.* p. 13).

**B.  The Law on Expert Testimony**

As a preliminary matter, neither party requested a *Daubert* hearing. Thus, the Court is not required to conduct a hearing; rather, it may decide the Motion on the briefing. *See Casey v. Geek Squad Subsidary Best Buy Stores, L.P.*, 823 F. Supp.2d 334, 343 n.7 (D. Md. 2011) (citing *Muovich v. Raleigh Cnty. Bd. of Educ.*, 58 F. App'x 584, 589 (4th Cir.2003)); *see also* Local Rule 105.6 (Md. 2023) ("Unless otherwise ordered by the Court . . . all motions shall be decided on the memoranda without a hearing.").

Pursuant to Federal Rule of Evidence 104(a), a court is responsible for determining "preliminary questions concerning the qualification of a person to be a witness" and "admissibility

---

[11] In support of its contention, Defendant relies on the Maryland state court case *Carter v. Shopper Foods Warehouse MD Corp.*, 727 A.2d 958 (Md. Ct. Spec. App. 1999). Defendant's reliance on *Carter* is misplaced, as it is federal law, not state law, that governs evidentiary issues such as expert admissibility in federal court. *See Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 476 (4th Cir. 2005) ("[T]he admissibility of expert testimony in federal court sitting in diversity jurisdiction is controlled by federal law. State law, whatever it may be, is irrelevant." (quoting *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1157 (4th Cir. 1986)).

of evidence," including the admissibility of expert testimony under Federal Rule of Evidence 702.

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. It is well settled that the party seeking admission of an expert's testimony "bears the burden of establishing admissibility by a preponderance of the evidence." *Fireman's Fund Ins. v. Tecumsah Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011); *see also Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283 (4th Cir. 2021). Accordingly, Plaintiff, the proponent of Mr. Foreland's testimony, has the burden of putting forth sufficient facts from which the Court can determine Mr. Foreland's qualifications to be an expert witness and the admissibility of his expert testimony. *See Fireman's Fund Ins.*, 767 F. Supp. 2d at 553; *see also Higginbotham v. KCS Intern*, 85 F. App'x 911, 916 (2004) (citing *Daubert*, 509 U.S. at 592 n.10).[12]

The Fourth Circuit has held that because an expert witness' testimony "[has] the potential to 'be both powerful and quite misleading,'" the Court's responsibility is to "ensure that any and all testimony" is both relevant and reliable, and that only relevant and reliable evidence is admissible. *Sardis*, 10 F.4th at 283-84 (further citations omitted). That is consistent with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 588.

---

[12] As the Rules Committee clarified in 2023 when it amended Rule 702, the burden is on the movant to establish the witness's expertise. Fed. R. Evid. 702 advisory committee's notes to 2023 amendment (explaining that the purpose of the 2023 amendment to Rule 702 is to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that the proffered testimony meets the admissibility requirements set forth in the rule").

As to relevance, evidence is relevant if it has a tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Fed. R. Evid. 401. Moreover, "expert testimony is only relevant if it has 'a valid [connection] to the pertinent inquiry.'" *Sardis*, 10 F.4th at 281 (quoting *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019)). In other words, the expert's testimony must "help[] the trier of fact to understand the evidence or to determine a fact in issue." *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (citations omitted); *see also Sardis*, 10 F.4th at 281. As to reliability, the Fourth Circuit has held that:

> *Daubert* provides four, non-exhaustive 'guideposts' to aid in the required reliability analysis: (1) whether the expert's theory or technique 'can' be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) 'the known or potential rate of error' inherent in the expert's theory or technique; and (4) whether the expert's methodology is generally accepted in [his or her] field of expertise.

*Sardis*, 10 F.4th at 281 (quoting *Daubert*, 509 U.S. at 593-94). These factors are meant to ensure that "an expert, whether basing [his or her] testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd., v. Carmichael*, 526 U.S. 137, 152 (1999).

In sum, the Court must determine whether the Plaintiff has established, by a preponderance of the evidence, sufficient facts from which the Court may conclude that: (1) Mr. Foreland is qualified in the field of expertise for which he is offered; and (2) Mr. Foreland's opinions are relevant and reliable. *See* Fed. R. Evid.702; *Sardis*, 10 F.4th at 281-82.

When an expert's opinion relies solely on his experience, courts generally "require slightly different considerations than other expert witnesses." *First Data Merchant Servs. Corp. v. SecurityMetrics, Inc.*, Civ. No. RDB 12-2568, 2014 WL 6871581 at *5 (D. Md. Dec. 3, 2024). The

Advisory Committee Notes to Rule 702 confirm that experience alone is sufficient to provide a foundation for expert testimony. *See* Fed. R. Evid. 702 advisory committee's notes to 2000 amendments; *see also JFJ Toys, Inc. v. Sears Holdings Corp. et al.*, 237 F. Supp.3d 311, 322 (D. Md. 2017). In fact, "experiential testimony need not rely on anything like the scientific method." *Casey*, 823 F. Supp.2d at345 n.9 (internal quotations and citations omitted); *see also JFJ Toys*, 237 F. Supp.3d at 322. Nonetheless, the facts that make up the basis of an experiential expert's qualifications cannot be "overbroad and devoid of specifics pertinent to the relevant [area of expertise]." *JFJ Toys*, 237 F. Supp.3d at 322. When the "witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes to 2000 amendments; *see also JFJ Toys*, 237 F. Supp.3d at 322. Expert testimony that is "rooted in subjective belief or unsupported speculation does not suffice." *Zuckerman v. Wal-Mart Stores E. L.P.*, 611 F. App'x 138, 138 (4th Cir. 2015).

As the Fourth Circuit has articulated, when challenging an expert's qualifications, "the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). Nonetheless, "expertise in one field does not qualify a witness as an expert in other fields." *JFJ Toys*, 237 F. Supp. 3d at 322 (citing *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 392 (D. Md. 2001); *see Grande Vista, LLC v. United States*, 660 F. Supp. 3d 550, 561-62 (D. Md. 2023).

Using these legal standards, the Court will now address the admissibility of Mr. Foreland's opinions that are relevant to the resolution of the summary judgment motion.

**C. Analysis Related to Plaintiff's Proposed Expert Witness**

1. <u>Opinions</u>

The record before the Court does not contain Mr. Foreland's expert report(s), nor does it contain a cogent and helpful summary of his proffered opinions. *See* JA0001-103. The record is not completely clear on all topics that Mr. Foreland would opine on, were he qualified as an expert. (*Id.*). In the Opposition, Plaintiff merely speaks in generalities about Mr. Foreland's opinions, and makes a passing reference to "Foreland's opinion is a retailer cannot put tripping hazards in the areas where customers will walk." (Opposition, pp. 11, 13).

From the unclear record, then, his relevant[13] proffered opinions—and his bases for the having the same—appear to be:

1. A "mat should not be located in the customer checkout area, in the customer lane." According to Mr. Foreland, this conclusion "is a retail industry type standard." He does not cite to any legal authority or policy supporting his opinion that there is such a standard. Rather, he says that his opinion is based on his experience at Walmart, and being a customer who visited "major retailers" like Target and Kroger, and observed that "they do not place mats in the customer checkout lane."

2. Relatedly, Mr. Foreland also opines that the National Floor Safety Institute ("NFSI") Checklist provides that "mats, gratings or other similar flooring are used wherever water or spills are likely," and workplaces "should ensure indoor walkways are free of [unspecified]." The NFSI Checklist "doesn't say that mats can't be used in a checkout aisle."

3. Relatedly, Mr. Foreland further opines that having a mat in the checkout lane created a "trip hazard," and that the Store Employee Safety Handbook ("Handbook") says that during operating hours, the Store is to "maintain aisles free of debris and any other slip or trip hazards at all times."

(Foreland Dep., JA0041-43, JA0055-61, JA0065, JA0068, JA0070-73).[14] From the record, it does

---

[13] Mr. Foreland offered opinions about other areas in stores where retailers place mats (e.g., produce aisle or dairy cases), none of which are relevant to this case. *See, e.g.,* JA0056, JA0057, JA0062.

[14] In its Motion *in Limine*, Defendant identifies Plaintiff's expert as Kevin "Forehand." Defendant summarizes Mr. Foreland's opinions as follows: **Opinion Number 1:** Dollar General personnel did not act safely or responsibly by placing a mat at the front checkout and by failing to maintain a safe shopping environment at the time of the incident. **Opinion Number 2:** If Dollar General personnel had acted safely and responsibly by following Doller General floor and safety policy, this incident very likely could have been avoided. (Motion, pp. 12-13).

not appear that Mr. Foreland has offered an opinion on the condition of the mat. (Foreland Dep., JA0055).

In sum, his ultimate opinion appears to be that it was a "negligent mode of operations" for the Store to have a floor mat in the checkout aisle. (Foreland Dep., JA0065).

2.  Education

Mr. Foreland has an Associate of Arts degree in Business from Thomas University, a Bachelor of Science degree in Business Administration from Thomas University, a Master of Business Administration from Thomas University, and a Doctor of Business Administration Management from Northcentral University. (Foreland Dep., JA0036-47). Mr. Foreland has no educational background in—nor has he taken any course specifically related to—safety. (Foreland Dep., JA0045). Mr. Foreland did not rely on his education in formulating his opinions. (Foreland Dep., JA0036-37).

Additionally, Mr. Foreland is not an engineer, has never been trained as an engineer, and does not hold any professional licenses. (Foreland Dep., JA0046). He also has no background in physics or biometrics, nor has he ever been trained or certified in human factors. (Foreland Dep., JA0045-46).

3.  Publications

Mr. Foreland has published the following two articles: "Supply Chain Efficiency in Discount Stores;" and "Radio Frequency Identification Technology," which do not relate to his proffered expertise in this case. (Foreland Dep., JA0037-38). He has never published any peer-reviewed articles in the field of retail store operations or safety and risk management. (Foreland Dep., JA0040).

4.  Prior Experience as an Expert Witness

Mr. Foreland has never been certified by any state or federal government as an expert in any field. (Foreland Dep., JA0045). There is no evidence that he has previously been qualified in state or federal court as an expert on any topic. (JA0024-72).

5.  Experience/Specialized Knowledge

Mr. Foreland currently has a business management consulting firm, although he has not had any clients in that field. (Foreland Dep., JA0047). He spends some time teaching an unspecified subject. (Foreland Dep., JA0046-47).

Mr. Foreland is not a member of NFSI, nor has he ever attended any of its meetings or seminars. (Foreland Dep., JA0042). Mr. Foreland has never been a member of—or served on—any committee formed by the following entities: NFSI; National Safety Council; National Fire and Protection Association; ASTM International; American National Standards Institute; National Institute for Occupational Health and Safety; International Property Maintenance Code Association. (Foreland Dep., JA0043-44). Mr. Foreland is a member of unnamed committees; apparently, they are listed on his resume, which is not in the record. (Foreland Dep., JA0037). However, Mr. Foreland's committee memberships do not relate to his proffered expertise. (Foreland Dep., JA0037).

Mr. Foreland has seventeen years of retail experience. In particular, Mr. Foreland worked at Walmart from 1989 to 1995, One Stop Music House from 1995 to 1996, and Sound FX from 1996 to 2006. (Foreland Dep., JA0029-32).

At Walmart, Mr. Foreland worked as an assistant store manager. (Foreland Dep., JA0030). Mr. Foreland did not write safety guidelines, risk analyses, or safety protocols while employed at Walmart, as doing so was not a responsibility that he would have had. (Foreland Dep., JA0035).

Nor did Mr. Foreland ever complete an incident report. (Foreland Dep., JA0072). Notably, of the three retailers for whom Mr. Foreland worked, only Walmart used floor mats. (Foreland Dep., JA0065). According to Mr. Foreland, Walmart did not place mats in customer checkout lanes. (Foreland Dep., JA0057).

There is no evidence in the record regarding what Mr. Foreland did or what his responsibilities were at One Stop Music House. *See* JA 0024-72.

During his employment at Sound FX, Mr. Foreland wrote safety guidelines, but does not still possess a copy of those guidelines. (Foreland Dep., JA0034-35). Mr. Foreland did not describe the subject matter of the safety guidelines; thus, there is no evidence that the safety guidelines pertained to mats, tripping hazards, or floor safety. *See* JA0024-72. Purportedly, Mr. Foreland's resume, which is not before the Court, describes that Mr. Foreland's responsibilities at Sound FX included "leadership and supervision, full profit and loss responsibility, inventory," "loss prevention supervision," and "store tours to visit with management teams." (Foreland Dep., JA0034).

In formulating his opinions, Mr. Foreland first draws on his general experiences in retail, which he believes qualifies him as an expert. (Foreland Dep., JA0039). In addition, Mr. Foreland primarily relies on his experience as a shopper, which he believes qualifies him to opine about the propriety of the mat's placement in the Store. (Foreland Dep., JA0062-63).

Regarding a standard of care related to where mats should be placed in a retail store, Mr. Foreland draws upon his experience "during his training and time with Walmart," although that training did not involve anything related to the NFSI Checklist. (Foreland Dep., JA0041).

6.  Facts, Principles, and Methodology

In order to formulate his opinions, Mr. Foreland reviewed the following: (1) the Complaint;

(2) the depositions of Plaintiff and of Ms. Jackson; (3) "the specifications for two different types of mats," which is not further elaborated on nor described; (4) a photo screenshot of the checkout area; (5) the incident report; (6) emails regarding mats purchased by the Store; (7) "twenty photographs," which were not further described; (8) "letters [sic] of preservation;" (9) "four exhibits;" (10) a page from the Handbook; and (11) the NFSI Checklist. (Foreland Dep., JA0026-27, JA0058).[15] He reviewed some of NFSI's standards of care for retail on its website and obtained the NFSI Checklist from that source. (Foreland Dep., JA0042).

When formulating his opinions about the mat, Mr. Foreland reviewed and credited as true Plaintiff's deposition testimony about the size of the mat, its location in the checkout aisle, and that it was "rolled up, causing her to trip and fall." (Foreland Dep., JA0049-50, JA0052-53). He has no idea what Plaintiff meant by using the term "rolled up," nor does he have any idea how the mat "got rolled up or how long it was rolled up" before Plaintiff fell. (Foreland Dep., JA0066-67). In addition, he has no knowledge regarding whether the mat in question was defective, nor does he know the material(s) used in creating the mat. (Foreland Dep., JA0050-51, JA0054). Furthermore, Mr. Foreland has no knowledge of any facts that anyone else ever tripped and fell on a mat in the checkout lane in the Store, nor does he know of any facts suggesting that anyone has ever tripped and fallen on a mat in the checkout aisle in any Dollar General Store. (Foreland Dep., JA0066).

Mr. Foreland has never seen any literature that states mats should not be placed in the checkout aisle. (Foreland Dep., JA0064). Mr. Foreland did not conduct any surveys related to mat placement in preparation for this case. (Foreland Dep., JA0039-40, JA0057). Nor did Mr. Foreland visit the Store as a way of aiding him in rendering his opinions. He has been to other Dollar General

---

[15] The following items identified by Mr. Foreland are not in the Joint Appendix: incident report, twenty photographs, four exhibits, a complete copy of the Handbook, and the NFSI Checklist. *See* JA0001-103.

stores as a customer, approximately five to ten times. (Foreland Dep., JA0047-48).

The Joint Appendix does not contain an explicit description from Mr. Foreland of his methodology or principles in opining about the propriety of the mat's placement. *See* JA0001-103. Instead, he seems to rely upon his retail experience at Walmart and the music stores, which he believes qualifies him as "an expert in the field of retail store operations, safety, risk management, and standards of care." (Foreland Dep., JA0039-40). In addition, Mr. Foreland relies on his experience as a shopper, which he believes qualifies him to opine about the propriety of the mat's placement in the Store. (Foreland Dep., JA0062-63). He "notices things" while shopping, and he goes to the grocery store more than twice a month. (Foreland Dep., JA0063).

Thus, although the evidence before the Court suggests that Mr. Foreland considered his retail and shopper experience when analyzing the facts, the record is devoid of a clear, linear explanation of how he applied his experience to the facts of this case. *See* JA 0024-72.

7. Mr. Foreland's Qualifications as an Expert Witness

Regarding Mr. Foreland's qualifications as an experiential expert, the Court finds *JFJ Toys, Inc. v. Sears Holdings Corp.* instructive. In that case, the court excluded expert testimony on toy air-powered launchers after finding the proffered expert's qualifications "wholly inadequate" for the areas in which he was offered as an expert. 237 F.3d at 323. In *JFJ Toys*, while the expert had been involved in marketing toys generally, his "self-admitted" expertise was overbroad and unspecific when it came to the relevant market of air-powered launchers and related marketing terms. *Id.* In addition, there was no evidence in the record that demonstrated the expert had experience regarding the specific toy at issue. *Id.* In fact, the court pointed out that the expert's only experience was working for a corporation that had denied involvement with that specific toy. *Id.* In concluding the expert was unqualified, the court explained that the expert had not published

articles on the relevant topic, never acted as an expert witness previously, nor had any experience, training, or education in the relevant field. *Id.*

Turning to Mr. Foreland's training and qualifications, the Court finds that they are similarly "wholly inadequate" for the areas of his offered expertise in retail store operations, safety, and risk management. Mr. Foreland has no educational background in safety nor taken any course related to safety. (Foreland Dep., JA0045). Indeed, Mr. Foreland admits that he did not rely on his education in formulating his opinions. (Foreland Dep., JA0036-37). In addition, Mr. Foreland is not an engineer, has never been trained as an engineer, and does not hold any professional licenses. (Foreland Dep., JA0046). He has no background in physics or biometrics, nor has he ever been trained or certified in human factors. (Foreland Dep., JA0045-46). Furthermore, Mr. Foreland's published materials do not relate to his proffered expertise in this case. (Foreland Dep., JA0037-38). He has never published any peer-reviewed articles in the field of retail store operations or safety and risk management. (Foreland Dep., JA0040).

Moreover, Mr. Foreland is not a member of NFSI and has not attended any of its meetings or seminars. (Foreland Dep., JA0042). In fact, Mr. Foreland has not served on a number of committees related to floor safety. (Foreland Dep. JA0043-44). While Mr. Foreland is a member of unspecified committees, there is no evidence before the Court as to what committees and Mr. Foreland admits that his committee memberships do not relate to his proffered expertise in this case. (Foreland Dep., JA0037).

Notably, Mr. Foreland's only retail experience is insufficient to qualify him as an expert in this case. While at Walmart, Mr. Foreland never filled out an incident report, nor did Mr. Foreland write safety guidelines, risk analyses, or safety protocols. (Foreland Dep., JA0035, JA0072). According to Mr. Foreland, such responsibilities were not something he would do as an assistant

manager. (Foreland Dep., JA0035). The only safety guidelines that Mr. Foreland purportedly wrote are not before the Court, nor is there evidence as to the substance of said guidelines. (Foreland Dep., JA0034-35). Thus, there is no evidence that the safety guidelines pertained to mats, tripping hazards, or floor safety. Mr. Foreland testified that only Walmart used floor mats; it is therefore reasonable to presume that Sound FX did not use floor mats. (Foreland Dep., JA0065). Accordingly, there is no evidence before the Court that Mr. Foreland has relevant experience in store operations, safety, and risk management that would allow him to opine as to the propriety of the mat's placement. *See JFJ Toys*, 237 F. Supp. 3d at 323 (finding that the proffered expert was unqualified to testify because he had no experience, training, or education in the relevant field).

## 8. The Reliability of Mr. Foreland's Opinions

With respect to Mr. Foreland's ultimate opinions, there is no evidence before the Court explaining how Mr. Foreland arrived at his conclusions—his methodology—or how he reliably applied his experience to the facts of the case. *See JFJ Toys*, 237 F. Supp.3d at 323. Indeed, as noted above, the record does not contain Mr. Foreland's expert report(s), nor a cogent and helpful summary of his proffered opinions. (JA0001-103). Instead, Mr. Foreland appears to generally rely on his retail experience and experience as a shopper to establish his expertise in retail store operations, safety, risk management, and standards of care, and to opine as to the propriety of the mat's placement in the Store. (Foreland Dep., JA0039-40, JA0062-63). The Court has already concluded that Mr. Foreland's experience is insufficient to establish him as an expert in his proffered field of expertise. Based on the evidence before the Court, it is clear that Mr. Foreland's opinions and conclusions lack "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. Mr. Foreland, thus, cannot be

permitted to offer his unfounded opinions in this case.[16]

9.  The Relevance of Mr. Foreland's Opinions

For the reasons stated above, the Court finds that Mr. Foreland's opinions are similarly not relevant because they would not be helpful to the trier of fact. *See Nease*, 848 F.3d at 229; *Sardis*, 10 F.4th at 281. First, Mr. Foreland lacks the requisite qualifications as an expert in retail store operations, safety, risk management, and standards of care. Second, Mr. Foreland has wholly failed to explain his methodology and how he reliably applied his experience to the facts of the case. Accordingly, his opinions would be unhelpful to the trier of fact and must be excluded.

## III.    CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment and Motion *in Limine*, (ECF No. 47), is **GRANTED**. The Clerk of the Court shall enter judgment in favor of the Defendant. The Clerk of the Court is further directed to **CLOSE** this case.

A separate Order will follow.

Date: February 5, 2025                                    _____/s/_____
                                                                         The Honorable Gina L. Simms
                                                                         United States Magistrate Judge

---

[16] To the extent Plaintiff maintains that Mr. Foreland was unable to conduct testing due to spoliation, Mr. Foreland was clear that he was not opining as to the condition or defective nature of the particular mat but mat placement generally. (Foreland Dep., JA0055). For that reason, whether Mr. Foreland tested the alleged spoliated mat is not specifically relevant to his proffered opinions in this case.